Albert Lautman v. Commissioner.
Lautman v. Commissioner
Docket No. 5497-65.
United States Tax Court
T.C. Memo 1967-232; 1967 Tax Ct. Memo LEXIS 30; 26 T.C.M. (CCH) 1192; T.C.M. (RIA) 67232; November 20, 1967
Samuel J. Foosaner, for the petitioner. Alan M. Stark, for the respondent. TANNENWALD
Memorandum Findings of Fact and Opinion TANNENWALD, Judge: Respondent determined the following deficiencies in and additions to petitioner's income tax: Addition to tax
(Sec. 6653(b), [1]
Year
Deficiency
1954 Code)
1955
$ 435.93
$ 217.97
1956
63,992.49
31,996.25
1957
2,592.58
1,296.29
1958
5,931.92
2,965.96
1959
8,064.85
4,032.43
1960
1,316.37
658.19
Petitioner has conceded many of the adjustments made by respondent. *31 The following issues remain for decision: (1) Were certain sums, concededly received by petitioner, taxable income to him? (2) Is any part of the deficiency for each year due to fraud? If not, is the deficiency for any year barred by the period of limitations? Findings of Fact Some of the facts have been stipulated and are found accordingly. At the time of filing the petition herein, Albert Lautman resided in New York, New York. He timely filed his cash basis tax returns for the years 1955 through 1960 and an amended return for 1960, on April 17, 1961, with the district director at Newark, New Jersey. On February 24, 1965, petitioner executed a consent extending the statute of limitations for the year 1958 to April 15, 1966. The deficiency notice for each year was mailed to petitioner on June 16, 1965. Petitioner had filled out his own tax returns for at least 15 years prior to the years in question. The parties stipulated the following with regard to certain items of income omitted by petitioner in the years in question: Reported on petitioner's return
Correct amounts as stipulated
Adjusted
Capital
Capital
gains
gains
Year
gross income
Dividends
Interest
or
Dividends
Interest
or
(losses)
(losses)
1955
$1,199.75
$2,249.75
[1,000.00)
$3,156.58
$ 17.50
$ 952.63
1956
9,339.42
1,879.42
$ 62,35
(1,000.00)
7,488.23
144.85
8,657.53
1957
777.09
1,560.39
424.05
(109.35)
6,958.81
926.66
5,394.38
1958
1,171.00
1,767.00
454.43
(1,000.00)
6,909.04
3,321.26
(1,000.00)
1959
749.96
1,021.50
673.73
(895.27)
5,752.49
3,812.41
13,929.65
1960
5,493.23
3,751.00
2,937.50
(895.27)
5,759.02
3,942.86
739.23
*32 Petitioner had been an active trader of securities since the 1920's and was well known by many securities analysts. Based on his reputation, he was engaged in 1956 by Hyman Marcus of U.S. Hoffman Machinery Corp. to do public relations work. His job was to improve the public image of Hoffman. He received during the year a total of $50,300 from Hoffman in payment of bills submitted by him for publicity services. The first $8,700 was paid to him directly by check as follows: $2,000 on March 28, 1956, $1,500 on April 6, 1956, and $1,300 each on April 13, April 20, April 27, and May 4, 1956, respectively. The remaining $41,600, at the request of petitioner, was paid to "International Press Service," a trade name used by petitioner, in a series of $2,600 checks commencing on May 11, 1956 and terminating August 28, 1956. All of the International Press Service checks were deposited in two checking accounts of International Press Service. These accounts were not drawn upon in 1956. Petitioner reported on his 1956 income tax return only $8,700 as compensation received from U.S. Hoffman Corp., although he now concedes receiving the entire $50,300. Hoffman treated the entire $50,300 as publicity *33 expenses. At the end of the year it filed two Forms 1099 (Information Return) with respect to this sum, one showing $8,700 paid to petitioner and a second showing $41,600 paid to International Press Service. Also in 1956, petitioner had an arrangement with Stahl Miles & Co., Ltd. similar to the one with Hoffman. During that year he received $20,000 from Stahl Miles in four $5,000 checks. Petitioner never reported any income from Stahl Miles. Also in 1956, petitioner sold 1,710 shares of preferred stock of Hoffman on behalf of one Herbert Cohen, who had bought the stock from a dissident shareholder at the request of Marcus. Petitioner received sale proceeds from the stock of $155,145.36 and paid Cohen $137,648. He made no other disbursements in connection with this transaction and never included on his tax returns any income from this sale. In 1957, petitioner sought to collect from Marcus additional sums related to the 1956 transaction with Hoffman. Accordingly, he engaged an attorney, paying him a retainer of $1,000. On his 1957 return, petitioner claimed a deduction in the amount of the retainer as legal expenses incurred pursuant to an "action to collect balance due for services *34 rendered." Marcus paid petitioner $13,500 in 1958 in settlement of the litigation. Petitioner did not report this payment as income on his 1958 return. Respondent determined the payment to be additional income to petitioner and allowed a deduction for the additional legal expenses incurred in 1958. In 1960, petitioner received $625 from Martin Taub as compensation for services rendered in the gathering of statistical information. Petitioner never reported this compensation. A criminal investigation of petitioner's income tax was begun in 1960 because the Forms 1099 on file with respondent indicated that petitioner had not reported all his dividends in the years 1954 to 1959. Initially, petitioner denied making any errors on his returns. He also denied doing business under any other name than Albert Lautman. Respondent's agent showed petitioner certain of the Forms 1099 with respect to dividends unreported by petitioner. Petitioner admitted his failure to report and claimed that the dividends must have been carelessly overlooked when he prepared his returns. The agent then requested petitioner to supply him with information relating to the banks and brokers with whom petitioner *35 dealt. Petitioner indicated he would do so at a later meeting. Petitioner also promised to recheck his records for the years in question and to prepare a full accounting of all his dividends and capital transactions. At the subsequent meeting, petitioner purported to comply with his promise by handing the agent a list showing omission of dividends from six corporations, three of the corporations being ones with respect to which respondent had shown petitioner Forms 1099. Petitioner claimed that the list was complete and refused to supply the agent with the names of his banks and brokers because he claimed the information was now unnecessary. The Forms 1099 in the possession of the agent indicated that the additional accounting of dividends still excluded many dividends received by petitioner, and the agent so informed him. Petitioner continued to deny that his list was incomplete. On February 14, 1964, petitioner entered a plea of nolo contendere for criminal tax evasion for the taxable year 1956 and was fined $10,000. Ultimate Findings of Fact The entire $50,300 received from U.S. Hoffman Machinery Corp., the $20,000 received from Stahl Miles & Co., Ltd. in 1956, the $17,497.36 *36 retained from the proceeds of the sale of the Hoffman preferred stock in 1956 on behalf of Herbert Cohen, the $13,500 received in 1958 from Marcus in settlement of the litigation, and the $625 received from Martin Taub in 1960 constituted compensation for services rendered and therefore taxable income to petitioner in the respective years. At least a part of the understatement of income by petitioner for each of the years 1955 to 1960 was due to fraud. Opinion Petitioner has conceded most of respondent's adjustments to income. The only issues remaining are the disputed income items detailed in our Findings of Fact and the question whether petitioner fraudulently understated his income. We hold for respondent on all issues. Petitioner testified at length during the trial of the case herein. He was the sole witness on his own behalf. He had a purported explanation relating to every item of omission. In the case of the conceded omissions from income, relevant only in connection with the fraud issue, his basic theme was that he was careless. His contention in regard to the income items still at issue is that each item had an offsetting cash expenditure. Petitioner was an active *37 trader of stocks, known by many analysts on Wall Street. Based on his reputation, Hyman Marcus of U.S. Hoffman engaged him in 1956 as a public relations specialist. His function was to improve the image of Hoffman and thereby improve the price of its stock. Petitioner claimed that he was a mere conduit of funds received by him from Hoffman beyond the $8,700 reported on his 1956 return. He claimed that, at the instruction of Marcus, he placed cash in excess of the $41,600 received in unmarked envelopes and over a period of time in 1956 gave approximately 50 of these envelopes, one at a time, to one Von Zehn. Von Zehn purportedly passed these envelopes along to various people unknown to, and unidentified by, petitioner. The precise purpose of the cash payments was not given by petitioner except to say they were related to his public relations services. Petitioner was unable to contact Von Zehn at the time of trial and, aside from petitioner's own testimony, there was no evidence that Von Zehn was other than a figment of petitioner's imagination. Indeed, there was testimony indicating that Von Zehn never existed. According to petitioner, the $13,500 received in settlement of a lawsuit *38 against Marcus in 1958 was also intended to reimburse petitioner for the excess mysterious cash distributions not covered by the checks received from Hoffman in 1956 and thus was properly excluded from his income. Petitioner's story in connection with the Stahl Miles payments was similar. Allegedly, he entered into a deal with Stahl Miles to recoup his losses from the Hoffman deal. Again, petitioner claimed to have made payment to Von Zehn of the $20,000 received from Stahl Miles. He asserted that his compensation was to be an option on 30,000 shares of Green Bay Mining Company, the sale of whose stock was apparently being promoted by Stahl Miles. Petitioner did not actually use the funds received to make the claimed payments. He conceded that such funds were deposited in certain checking accounts and not drawn upon during 1956. By way of explanation, petitioner claimed that he obtained the cash for the payments from a cash hoard derived from two sources - a safe-deposit box in New Jersey and his mother's jewelry box, which he acquired upon her death in 1952. According to his testimony, the funds in the safe-deposit box derived mainly from the timely closing in 1933 of an account *39 with the Bank of the United States immediately prior to the closing of that bank. The safe-deposit box allegedly contained $25,000. The jewelry box purportedly contained $13,000. Petitioner testified that the safe-deposit box was closed in 1952 but gave no explanation of the location of the funds between 1952 and 1956. Petitioner thus would have us believe that cash disbursements in 1956 of almost $75,000 were covered by a cash hoard which, by his own testimony, amounted at best to $38,000. We think it significant that all of the payments from Hoffman in excess of $8,700 and the $13,500 from Marcus were in the form of checks to "International Press Service," a trade name used by petitioner. It seems more likely that such payments were not reported because petitioner felt that International Press Service would provide a cover, with the result that the payments might never be picked up. The long and the short of the situation is that we find petitioner's testimony in regard to the cash payments totally unbelievable. We are satisfied that petitioner was not a conduit for such payments. Perhaps it was expected by the parties that petitioner would have expenses in connection with *40 his public relations work for which he was to be reimbursed. But if that were the case, it was incumbent upon petitioner to satisfy his burden of proof with something more than his uncorroborated (and, indeed, contradicted) testimony that he made payments in undisclosed amounts to undisclosed persons through a seemingly ephemeral intermediary. [2]
The $17,497.36 item received in connection with the sale of stock for Herbert Cohen also is related to petitioner's dealings with Hoffman. Marcus had requested a banker, Cohen, to purchase certain Hoffman preferred stock owned by a dissident shareholder. On the advice of Marcus, Cohen turned this stock over to petitioner to sell it on Cohen's *41 behalf. Petitioner sold the stock, receiving net proceeds of $155,145.36. Petitioner's records indicate that he paid two checks to Cohen, totaling $137,648. Petitioner testified that he paid the balance of the proceeds to either Marcus or Cohen - in cash. Both deny receiving this sum, though Cohen, of course, admits receiving the $137,648. In view of our opinion of petitioner's credibility, we find petitioner's uncorroborated testimony insufficient to satisfy his burden of proof. We think it more likely that petitioner was allowed to keep anything he could get in excess of $137,648 as compensation for his services in effecting the sale. The final income issue arises with respect to 1960, when petitioner received $625 from Martin Taub. Petitioner contends that this amount was paid to him solely as a reimbursement for travel expenditures incurred in connection with securing certain information for Taub. He offered no corroboration in substantiation of the purported expenditures. On the other hand, Taub testified that the payments were compensation for the service of petitioner in securing certain statistical information. Moreover, we note that the checks were made payable to International *42 Press Service. In the absence of further proof of expenditures, we find that the $625 was includable compensation to petitioner. In view of the foregoing, we hold that the disputed items constituted income taxable to petitioner within the broadly inclusive provisions of section 61. [3]
The final issue is whether petitioner, on his returns, fraudulently understated his income. If he did, the period of limitations has not run on any of the years and respondent properly assessed the 50 percent addition to tax. [4]
At the outset, we note that if any part of a deficiency for a particular year is due to fraud, the addition to *43 tax attaches to the entire deficiency for that year. (C.A. 3, 1940), affirming ; . The substantial omissions themselves, as indicated by the table set forth in our Findings of Fact, are a strong indication of fraud. ; (C.A. 8, 1961), affirming a Memorandum Opinion of this Court; (C.A. 6, 1956), affirming a Memorandum Opinion of this Court; ; . Petitioner's only explanation for the omissions of dividends, interest, and capital gains was careless bookkeeping. He testified that prior to the years in question he kept all of his securities in "street name." Thus, the information sent to him by his brokers provided him with the necessary information for his tax returns. However, around 1955 petitioner started registering some securities in his own name and just forgot to keep a record of the *44 dividends. At one point, he stated that, inasmuch as he was a trader or speculator, dividends were of minor consequence to him. Unfortunately for petitioner, we simply can not accept his explanation. The amount of dividends received but not reported by him is too substantial to be of no consequence to him. We note that his broker records would have disclosed all his sales of stock, yet he only reported some of his stock transactions. Moreover, we note that, on his returns, petitioner was considerably more accurate in reporting his loss transactions than he was in reporting his gain transactions. We think the more plausible explanation is that he neglected to report those items he thought would not be traced to him. This pattern is particularly revealed in the use of International Press Service. Petitioner's return included the Hoffman payments made directly to him but excluded those paid to International Press Service - the $41,600 from Hoffman, the $20,000 from Stahl Miles, the $13,500 from Marcus, and the $625 from Taub. One of respondent's agents testified as to petitioner's lack of cooperation in the audit of his return. Thus, after petitioner had admitted some, but not all, *45 of his omissions of dividends and capital gains, petitioner refused to disclose the names of the brokers and banks with whom he dealt because he claimed he had made a full accounting. Moreover, as we have already noted, petitioner's testimony in regard to the income issues was plagued with inconsistencies and lacked the ring of truth. We think the foregoing is sufficient to demolish petitioner's credibility, but, if additional evidence for this limited purpose were necessary, it could be found in his conviction on a plea of nolo contendere to the charge of criminal tax evasion for the taxable year 1956. Compare (C.A. 3, 1957), affirming , and (C.A. 5, 1955), affirming , wich (C.A. 5, 1957). We conclude that, simply on the basis of all the facts before us relating to the conceded omissions from petitioner's income, respondent has established fraud by clear and convincing evidence and has thus met his burden of proof. We are constrained to note additionally that the circumstances *46 surrounding the omission of the disputed items of income are also strongly indicative of fraud. [5]
*47 Decision will be entered for the respondent. Footnotes
1. All references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. In connection with his work for Stahl Miles, petitioner further claimed that he had been required to make good on certain guarantees which he had given certain individuals to cover their losses from the sale of Green Bay Mining stock in which they had invested on petitioner's recommendation. Although these claimed payments amounted to several thousand dolars, petitioner was unable to remember the names of any of the recipients of such guaranty payments. We find this testimony equally incredible.↩
3. Even if the $17,497.36 which petitioner retained from the sale of the Hoffman preferred shares on behalf of Cohen may not have technically been compensation for services, petitioner has not overcome the presumptive correctness of respondent's determination that the conceded receipt of this sum was taxable income.↩
4. We note that, in light of the substantial omissions from income and petitioner's extension of the statute of limitation for 1958, the years 1958, 1959, and 1960 were still open at the time of the deficiency herein under section 6501(e).↩
5. Subsequent to the trial herein, petitioner pro se moved for a new trial principally on the ground that his counsel had failed to introduce certain allegedly material evidence. On July 20, 1967, the Court issued an order denying petitioner's motion but affording him the opportunity at any time to and including September 1, 1967 to move to reopen the record, such motion to be accompanied by a tender of all such documentary or other written evidence. A subsequent order extended petitioner's time until October 1, 1967. No formal motion was ever submitted, although petitioner engaged in correspondence with the Court and, at his request, his counsel forwarded certain material to the Court. We do not consider the procedure followed by petitioner as having been in compliance with our order of July 20, 1967. But, even if we were to consider petitioner's correspondence as constituting such compliance, we would be constrained to deny his motion. Much of the supplementary material constitutes hearsay and, in any event, our examination of such material clearly reveals that none of it would change the conclusions reached herein. The same can be said for Petitioner's Exhibits Marked for Identification Nos. 22 and 23 which the Court excluded at the trial because they constituted the purest form of hearsay.↩